UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| THAIS ERTHAL, | |
| Plaintiff, | Civil Action No. 09-5580 (SDW)(MCA) |
| v. | **OPINION** |
| HAPAG-LLOYD (AMERICA) INC., | |
| Defendant. | June 8, 2011 |

**WIGENTON**, District Judge.

Before the Court is Defendant Hapag-Lloyd Inc.'s ("Hapag-Lloyd" or "Defendant") Motion for Summary Judgment ("Motion") pursuant to Fed. R. Civ. P. 56(c). This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1367. Venue is appropriate in this District pursuant to 28 U.S.C. § 1391(b). This Motion is decided without oral argument pursuant to Fed. R. Civ. P. 78. For the reasons stated below, this Court grants Defendant's Motion.

**FACTUAL AND PROCEDURAL HISTORY**

This lawsuit arises from Defendant's termination of Thais Erthal ("Plaintiff" or "Erthal"). In May 2006, Defendant, an international shipping company, hired Erthal as a Product Management Coordinator ("PMC") for its Oceania/Australasia routes. (Def.'s Statement of Facts ¶ 2; Erthal Dep. 31:12-15; Moreano Dep. 11:11-15.) Plaintiff worked in Defendant's Piscataway location. About sixty to seventy percent of Plaintiff's responsibilities consisted of slot control functions for trade from North America to Oceania/Australasia and the remainder of her duties was in pricing, analysis, and other duties. (Erthal Dep. 39:19-23; O'Boyle Dep. 11:15-21; Smith Dep. 9:16-19.) Erthal reported directly to Patrick O'Boyle ("O'Boyle") and indirectly

1

to David Smith ("Smith"), the Director of Product Management for the Oceania and Latin America services. (Erthal Dep. 31:19-23; Smith Dep. 7:20-23.) Plaintiff, who is not a United States citizen, held an L-2 visa. Therefore she had to renew her Employment Authorization Documentation Card ("EAD") every two years to be able to work legally in the United States. (Erthal Dep. 41:2-8.)

In October 2008, Plaintiff requested a leave of absence because she was expecting a child. (Def.'s Statement of Facts ¶ 15.) Erthal sought to take the maximum protected leave available. (Erthal Dep. 49:18-22.) Plaintiff discussed her plans with Hapag-Lloyd's HR department and O'Boyle and Defendant advised that she could take twelve weeks of paid Family Medical Leave Act ("FMLA") leave, as well as twelve weeks of unpaid leave under the New Jersey Family Leave Act ("FLA"). (Id. at 49:1-13.) Consequently, Erthal took twenty-eight weeks of protected leave. Although there was some confusion as to Plaintiff's return date, Plaintiff testified that O'Boyle and Smith worked with her to ensure that she returned on the originally agreed date of April 13, 2009. (Id. at 50:2-20, 51:17-20; Gousman Certif. Ex. H.)

On April 3, 2009, Hapag-Lloyd announced a global restructure in response to the worldwide economic crisis. (Gousman Certif. Ex. I.) The restructuring was scheduled to occur in June 2009. (Smith Dep. 8:2-4.) As part of the restructuring, all slot control functions were transferred to Tampa, Florida. (Id. at 11:12-22.) As a result, a majority of Plaintiff's responsibilities were transferred to Tampa. (O'Boyle Dep. 11:19-24.) Plaintiff's supervisor absorbed the remaining thirty to forty percent of Plaintiff's non-slot control duties. (Id. at 11:22-12:2.) However, Plaintiff was not the only PMC affected by this development. Robert Wilson ("Wilson") and Rafael Moreano ("Moreano") were also affected. (Moreano 12:25-13:5, 15:17-24; Gousman Certif. Ex. I, at 1.)

On April 1, 2009, prior to Defendant's announcement of its restructuring plans, Smith called Plaintiff and advised her that all slot control functions were being transferred to Tampa. (Erthal Dep. 56:12-57:3.) According to Plaintiff, Smith also informed her that other positions would be opening up in other departments and she would be considered for one of those positions. (Id. at 57:4-6.) Plaintiff testified that she understood she "would either have to move to Tampa or look for another position." (Id. at 57:15-18.) About a week later, Smith and O'Boyle called Erthal again and informed her that she would be terminated on June 30, 2009, unless she applied for another job. (Id. at 57:20-58:6.)

As part of the reorganization, Defendant created a new position: Coordinator-Trade Management ("CTM") in Piscataway to handle pricing, HIP, tariffs, and FIS[1] between Latin America and Oceania. (Gousman Certif. Ex. R.) The individuals considered for the new position were: Erthal, Wilson, and Moreano. (Smith Dep. 21:15-19.) In early April, prior to Plaintiff's return, Smith chose Moreano to fill the CTM position. (Id. at 15:23-16:11.) Smith testified that Erthal taking a twenty-eight week maternity leave had no impact on his decision-making, (id. at 17:11-16); instead, his decision was based on experience, performance evaluations, and the candidates' overall qualifications. As part of the evaluation Smith ranked the candidates in twelve different categories on a scale of 1-5. (Gousman Certif. Ex. P.) Some of the categories considered were: years of experience, functional skill level, productivity, promotability, and growth potential. (Id.) Smith provided concrete reasons for his rankings.

For instance, on functional skill level Moreano's rank was five (5), Wilson's was four (4), and Erthal was four (4). Smith testified that he ranked them in that order because Wilson and Erthal "were below Rafael, [] Rafael had a high expertise in those functions. And those individuals would go to Rafael for guidance, if they had problems with the workings on the

---

[1] The parties do not explain what HIP and FIS stand for.

3

systems, and were not clear on how to do things." (Smith Dep. 28:20-29:1.) With regard to promotability, Moreano was ranked at five (5), Wilson at four (4), and Erthal at two (2). (Gousman Certif. Ex. P.) Smith provided the following as his reasoning for the ranking:

> Rafael had a high ranking because he exceeded expectations in most areas of his work. And Robert, while strong operationally, was not strong commercially and analytically. Thais was strong operationally, not as strong commercially. And, but also, she had allowed her work authorization to lapse twice. And it is very difficult for me as a manager to promote someone and propose promotion for an individual that has not got . . . the self-planning . . . to make sure that those sort of issues do not arise. Managers are expected to be there to do a job. We could not afford to have a three- or five-month gap if a work authorization was delayed.

(Smith Dep. 30:16-31:6.)

Ultimately, Moreano had the highest score of fifty-five (55), Wilson's score was forty-nine (49), and Erthal had the lowest score of thirty-nine (39). (Gousman Certif. Ex. P.) According to Smith, he thought Moreano was the best candidate because of his experience in the Latin America trade and because he was stronger in the commercial environment than Wilson and Erthal. (Smith Dep. 14:13-15:8.)

On April 13, 2001, Plaintiff returned to work as planned. (Smith Dep. 17:4-6.) Prior to her return, Smith ensured that any available opportunities would be communicated to Erthal. (Gousman Certif. Ex. J.) Moreover, after her return, O'Boyle encouraged Erthal to inquire about other positions within the company and apply for them. (Gousman Certif. Ex. M; Erthal Dep. 112:13-24.) In fact, O'Boyle told Plaintiff about several positions that had opened up and asked her to apply for those positions. (O'Boyle Dep. 14:25-15:2.) For instance, on April 15, 2001, O'Boyle emailed Plaintiff about a Corporate Control Coordinator position. (Gousman Certif. Ex. M, at 2.) However, Erthal was not interested in applying for the position. (Id.) Furthermore, on May 1, 2009, O'Boyle told Erthal about three available positions in the

4

company and encouraged her to apply to the manager's position. (Gousman Certif. Ex. N, at 1.) Erthal responded: "Yes, I would be interested, although I didn't sound too excited. I just don't know if it's too late (I will talk to you about it later), plus I don't know if I would get the job (if the company believes that I am not good enough to keep on doing my current job as coordinator, go figure if they will give me a manager's job)." (Id.) Plaintiff did not apply for that job either.

Plaintiff alleges that she did not apply for any of these positions because "[t]he only available jobs in Piscataway were jobs for which [she] [] was not qualified." (Compl. ¶ 11.) However, she later stated that she was eligible to apply for those jobs but she did not apply because she was not "comfortable continuing working for a company who [she] [] felt discriminated against," and she was not "interested in working in finance or operations. Never did anything similar to that and [she] [] didn't have the interest to." (Erthal Dep. 101:11-19, 103:1-104:17.) Furthermore, Plaintiff testified that she did not apply because she had already retained an attorney to initiate a lawsuit against Defendant. (Id. at 111:12-112:12.)

On September 9, 2009, Plaintiff filed a complaint in the Superior Court of New Jersey, Middlesex County, alleging wrongful discharge under New Jersey Law Against Discrimination, N.J. Stat. Ann. 10:5-1 et seq., ("LAD") (Count One), hostile work environment under LAD (Count Two), common law wrongful discharge (Count Three), and intentional infliction of emotional distress (Count Four). (Compl. ¶¶ 13-20.) On November 2, 2009, Defendant removed the action to the United States District Court for the District of New Jersey.

**SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a).  The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  A fact is only "material" for purposes of a summary judgment motion if a dispute over that fact "might affect the outcome of the suit under the governing law."  Id. at 248.  A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.  The dispute is not genuine if it merely involves "some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the non-moving party to carry its burden of proof.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  Once the moving party meets its initial burden, the burden then shifts to the non-movant who must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations, speculation, unsupported assertions or denials of its pleadings.  Shields v. Zuccarini, 254 F.3d 476, 481 (3d Cir. 2001).  "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'"  Marino v. Indus. Crafting Co., 358 F.3d 241, 247 (3d Cir. 2004) (quoting Anderson, 477 U.S. at 255).

The nonmoving party "must present more than just 'bare assertions, conclusory allegations or suspicions' to show the existence of a genuine issue."  Podobnik v. U.S. Postal Serv., 409 F.3d 584, 594 (3d Cir. 2005) (quoting Celotex Corp., 477 U.S. at 325).  Further, the

6

nonmoving party is required to "point to concrete evidence in the record which supports each essential element of its case." Black Car Assistance Corp. v. New Jersey, 351 F. Supp. 2d 284, 286 (D.N.J. 2004). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson, 477 U.S. at 249. "Such affirmative evidence - - regardless of whether it is direct or circumstantial - - must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance." Williams v. Borough of West Chester, 891 F.2d 458, 460-61 (3d Cir. 1989). If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which . . . [it has] the burden of proof," then the moving party is entitled to judgment as a matter of law. Celotex Corp., 477 U.S. at 322.

## DISCUSSION

**1. Sex Discrimination (Wrongful Termination) under LAD**

New Jersey courts have adopted the Supreme Court's analysis in anti-discrimination statutes when analyzing claims under LAD. Grigoletti v. Ortho Pharm. Corp., 118 N.J. 89, 97 (1990). Consequently, New Jersey applies the burden-shifting test espoused in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). The McDonnell Douglas framework is a three-step process which requires the employee to prove a *prima facie* case of discrimination by a preponderance of the evidence. McDonnell Douglas Corp., 411 U.S. at 802. Establishing a *prima facie* case gives rise to a presumption of discrimination. Andersen v. Exxon Co., U.S.A., 89 N.J. 483, 492-93 (1982). The burden then shifts to the employer to rebut the presumption "by articulat[ing] some legitimate, nondiscriminatory reason for" its actions. Goodman v. London Metals Exch., 86 N.J. 19, 31 (1981) (alteration in original) (quoting McDonnell Douglas Corp., 411 U.S. at 802) (internal quotation marks omitted). The employee is then given the opportunity

7

to show by a preponderance of the evidence that the nondiscriminatory reason given by the employer was merely a pretext for the discrimination. Goodman, 86 N.J. at 32. While discrimination must be intentional, the employee may prove the employer's intent to discriminate by either direct or indirect circumstantial evidence. Greenberg v. Camden Cnty. Vocational & Technical Sch., 310 N.J. Super. 189, 198 (App. Div. 1998); see also Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981) (a plaintiff may prove discrimination "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.").

In a discriminatory discharge case, the initial burden of establishing a *prima facie* case is met when a plaintiff demonstrates by a preponderance of the evidence "[1] that he was in the protected [] group, [2] that he was performing his job at a level that met his employer's legitimate expectations, [3] that he nevertheless was fired, and [4] that [the employer] sought someone to perform the same work after he left." Clowes v. Terminix Int'l, Inc., 109 N.J. 575, 597 (1988) (alteration in original) (quoting Leob v. Textron, Inc., 600 F.2d 1003, 1014 (1st Cir. 1979)) (internal quotation marks omitted); see also Andersen, 89 N.J. at 492. The plaintiff satisfies the fourth prong by "showing that the challenged employment decision . . . took place under circumstances that give rise to an inference of unlawful discrimination." Williams v. Pemberton Twp. Pub. Sch., 323 N.J. Super. 490, 502 (App. Div. 1999). One circumstance that may give rise to an inference of unlawful discrimination is a showing that the "plaintiff was replaced by an individual outside the protected class." Id. at 503.

For the purposes of this Motion, Defendant concedes that Plaintiff has met the first three elements of a *prima facie* case under LAD. (Def.'s Reply Br. 2.) However, Defendant argues that even if Plaintiff has satisfied the first three elements, she will not be able to establish a *prima*

8

*facie* case because she cannot satisfy the fourth element. (Id.) This Court agrees. The evidence shows that about sixty to seventy percent of Erthal's job responsibilities were transferred to Tampa as a result of the reorganization. (Smith Dep. 11:12-22.) However, Plaintiff was not the only PMC impacted by Defendant's reorganization. (Moreano 12:25-13-5, 15:17-24; Gousman Certif. Ex. I, at 1.) Therefore, Plaintiff was not singled out for the adverse employment action. Erthal was also given the option of relocating to Tampa but she declined the offer. (Erthal 57:15-18.) Additionally, the remaining thirty to forty percent of Plaintiff's duties were absorbed by her supervisor. (O'Boyle Dep. 11:22-12:2.) Although Moreano assists O'Boyle in some of these responsibilities, (Moreano Dep. 15:14-16), O'Boyle took over the bulk of Plaintiff's pricing responsibilities. (Id. at 15:3-7.) See Young v. Hobart W. Grp., 385 N.J. Super. 448, 460 (App. Div. 2005) (concluding that the absorption of the plaintiff's duties by her supervisor and another employer did not constitute replacement by someone outside of the protected group for purposes of LAD). Furthermore, Moreano provided assistance to O'Boyle even before the company was reorganized. (Erthal Dep. 36:8-16; Moreano Dep. 19:12-15, 25:22-26:2; Smith 9:7-8.) Hence, the fact that he assists O'Boyle does not establish that he replaced Erthal. Additionally, Moreano testified that he did not "take over any of the responsibilities that [Plaintiff] had previously been doing." (Moreano Dep. 18:10-13.)

Moreover, to the extent that Plaintiff is arguing that Moreano replaced her because he was selected for the CTM position, this Court finds that argument meritless. The position Moreano currently fills is a new position. (Gousman Certif. Ex. R.) Therefore, Moreano's responsibilities are different from what Plaintiff did previously. (Moreano Dep. 18:17-19:5.) Erthal even admits that Moreano's current position involves responsibilities that are different from what she did. (Erthal Dep. 66:5-10.) Thus, Plaintiff was not replaced by someone outside

9

of the protected group.  Erthal has also failed to show any other circumstances that would give rise to an inference of unlawful discrimination.  Consequently, Plaintiff has failed to make a *prima facie* showing of discrimination.

Even if O'Boyle's absorption of Plaintiff's non-slot control duties is enough to satisfy the fourth element and establish a *prima facie* case of discrimination, Defendant can rebut the presumption because it has "articulate[ed] some legitimate, non-discriminatory reason for" its actions.  Goodman, 86 N.J. at 31 (citations and internal quotation marks omitted).  The bulk of Erthal's job responsibility, slot control, was transferred to Tampa as a result of the reorganization that occurred in April 2009.  (Erthal Dep. 56:12-57:3.)  Defendant restructured its operations in response to a worldwide economic crisis.  (Gousman Certif. Ex. I, at 2.)  Hapag-Lloyd did not embark on a company-wide reorganization merely to strip Plaintiff of a majority of her responsibilities.  Moreover, Plaintiff was not the only PMC affected by the reorganization.  In addition, Plaintiff testified that Defendant treated her professionally when she was terminated. (Erthal Dep. 132:17-20.)  Although she alleges that her "supervisors had issues regarding the amount of time she was taking off," (Compl. ¶ 7), she later testified that O'Boyle and Smith were polite and supportive in her decision to stay on leave and no one told her "that it would be a problem if [she] [] remained out until April 13th."  (Erthal Dep. 52:1-25, 56:1-4.)  Also, she stated that neither O'Boyle nor Smith treated her differently because she went or leave or because she had a baby.  (Id. at 107:9-16.)

Furthermore, Defendant asserts that Moreano was selected for the new position because he was the best qualified candidate for the position.  Smith testified that he chose Moreano for the new position because of his performance and his experience in the Latin America trade.  (See

Smith Dep. 14:13-15:8.)  Additionally, Smith articulated legitimate nondiscriminatory reasons for his scores.  (See Id. at 30:16-31:6.)

Nonetheless, Erthal argues that Defendant's reasons are pretext for the discrimination. First, she maintains that she should not have been terminated because she was the only PMC whose trade was not "entirely shifted out of New Jersey." (Pl.'s Opp'n Br. 6.)  However, that does not prove pretext.  Defendant's reasons for restructuring the company was to "optimiz[e]" and prevent the company from further economic "deteriorat[ion]." (Gousman Certif. Ex. I, at 2.) Therefore, O'Boyle's absorption of the remaining thirty percent of Erthal's responsibilities reflects Hapag-Lloyd's legitimate efforts to stay afloat in trying economic times.  Defendant's reasons for restructuring the company are not in dispute.  See Young, 385 N.J. Super. at 460 (concluding that the elimination of the plaintiff's position as "a cost reduction measure in response to an economic downturn" was a legitimate nondiscriminatory reason).

Second, Erthal avers that Smith's assertion that Moreano was the best choice because he had experience in the Oceania and Latin America trades is inaccurate because "Moreano had no experience in the Oceania trade." (Pl.'s Opp'n Br. 6.)  The evidence indicates otherwise.  In 2007 Defendant had to terminate Erthal because she failed to renew her EAD.  Erthal stayed home for forty days pending the renewal of her EAD.  (Id. at 43:1; Gousman Certif. Ex. F, at 2.) During that forty-day period Moreano did pricing, stock control and reporting for the Canada to Oceania trade.  (Moreano Dep. 26:3-7.)  Additionally, he updated the tariff system and the rotation maps on the internet.  (Erthal Dep. 43:10-21.)  Moreano had such a good grasp of the trade line that he trained the temp who covered for Erthal during her temporary termination. (Moreano Dep. 26:7-9.)  In contrast to Moreano who had Oceania and Latin America experience, Erthal only worked in the Oceania trade during her employment at the company.  Plaintiff argues

11

that Erthal gained experience with the Latin America trade while employed by a different company in Brazil. (Pl.'s Opp'n Br. 7.) However, unlike Plaintiff, Moreano's Latin America trade experience was with Hapag-Lloyd.

Additionally, Smith did not base his decision solely on the candidates' experience with the Oceania and Latin America trades. For example, Plaintiff fails to address Defendant's valid concern that Plaintiff allowed her EAD to lapse on two different occasions and the company could not afford to promote an individual who could not plan ahead and ensure that such issues do not arise. As Smith pointed out the company could not have one of its managers out of work for an extensive period of time. (Smith Dep. 30:21-31:6.) Smith also concluded that Moreano had a higher functional skill level than Erthal. According to Smith, Wilson and Erthal scored lower than Moreano because he "had a high expertise in those functions." (See Id. at 28:20-29:1.) Plaintiff does not dispute Smith's determination. Erthal actually testified that Moreano is "outstanding . . . . [h]e's very good." (Erthal Dep. 62:25.) She also admitted that she and Moreano had "almost identical" performance reviews. (Pl.'s Opp'n Br. 8.) Therefore, contrary to Erthal's assertion, she was not more qualified that Moreano. See Leshinksky v. Fairleigh Dickinson Univ., 1990 U.S. Dist. LEXIS 13256, at *39-40 (D.N.J. Aug. 8, 1990) (concluding that the defendant provided a legitimate nondiscriminatory reason for not hiring the plaintiff because nothing in the record indicated that she was more qualified than the male candidate the defendant hired).

However, Plaintiff asserts that Smith's decision is not legitimate because he did not consult the supervisors who worked closely with her and Moreano. (Pl.'s Br. 7.) This argument lacks merit. Smith testified that he "had a very good understanding of the performance of all three [candidates] . . . having worked very closely with them since 2006." (Smith Dep. 13:22-

25.) He also stated that he worked as closely with Erthal as she did with supervisor, O'Boyle. (Id. at 14:1-9.) Additionally, Smith stated that it would have been inappropriate to consult their supervisors because "there was a period of one week in which the senior management had to decide which people would be given positions, and that also included the managers [(supervisors)]. So, it would not have been appropriate for us to discuss with those managers who would be the best candidates." (Id. at 13:16-21.) Furthermore, Smith, to some extent, incorporated the input of the candidates' respective supervisors because their performance reviews were considered as part of his decision making process and those performance reviews were prepared by the supervisors.

Erthal's burden at this stage of the burden-shifting framework requires her to "demonstrate that the employer was motivated by discriminatory intent." Zive v. Stanley Roberts, Inc., 182 N.J. 436, 449 (2005). "[S]imply show[ing] that the employer's reason was false" is not sufficient. Id. Erthal testified that O'Boyle and Smith were polite and supportive in her decision to stay on leave until April 13th. (Erthal Dep. 52:1-25, 56:1-4.) Also, she stated that neither O'Boyle nor Smith treated her differently because she went on leave or because she had a baby. (Id. at 107:9-16.) Furthermore, she testified that she had a positive relationship with both Smith and O'Boyle and they treated her well. (Id. at 106:7-16.) Overall, Defendant has produced enough evidence to show that Moreano was more qualified than Erthal. Nothing in the record indicates that Erthal was more qualified than Moreano or Wilson. Similarly, Plaintiff has failed to demonstrate that Defendant's reasons for its actions are merely pretext. She clearly had the opportunity to apply for other jobs within the company and in fact her supervisor encouraged her to do so. (See Gousman Certif. Exs. J, M, N, at 1; Erthal Dep. 112:13-24.) Plaintiff admitted that Wilson and another PMC who applied for other positions within the company were hired.

13

(Erthal Dep. 121:25-122:20.)  However, Erthal had no interest in applying for any other jobs with Hapag-Lloyd.  Consequently, Erthal has not established that she was sexually discriminated against under LAD and Defendant is entitled to summary judgment on this claim.[2]

### 2. Hostile Work Environment under LAD

To state a claim for hostile work environment a plaintiff must establish by a preponderance of the evidence that "the complained-of conduct (1) would not have occurred *but for* the employee's gender; and it was (2) *severe or pervasive* enough to make a (3) *reasonable woman* believe that (4) the conditions of employment are altered and the *working environment is hostile or abusive*."  Lehmann v. Toys 'R' Us, 132 N.J. 587, 603-04 (1993).  The New Jersey Supreme Court has "emphasize[d] that it is the *harassing conduct* that must be severe or pervasive, not its effect on the plaintiff or on the work environment."  Id. at 606 (citing Ellison v. Brady, 924 F.2d 872, 878 (9th Cir. 1991)).  "'[T]he required showing of severity or seriousness of the harassing conduct varies inversely with the pervasiveness or frequency of the conduct.'"  Id. at 607 (quoting Ellison, 924 F.2d at 878).

Plaintiff's brief in opposition to Hapag-Lloyd's Motion does not address her claim for hostile work environment.  This Court finds that Defendant is entitled to summary judgment on this claim because Erthal has failed to demonstrate that she was subjected to any severe or pervasive conduct.  Plaintiff testified that O'Boyle and Smith treated her well during her tenure at Hapag-Lloyd and she had a positive relationship with them.  (Erthal Dep. 106:7-16.)  She also testified that none of the other employees "treat[ed] [] [her] poorly" during her employment with Defendant because of her gender and no one made disparaging statements to her.  (Id. at 124:14-20.)  However, she stated that she felt uncomfortable on some occasions.  When asked to explain

---

[2] In light of the Court's determination that Erthal has failed to establish a claim for sex discrimination under LAD, Plaintiff's claim for compensatory and punitive damages under LAD is dismissed as moot.

why she felt uncomfortable she stated: "Because there were . . . mainly men around. And they'd make jokes. Sometimes I feel like I'm not part of the group. So that's a little bit uncomfortable." (Id. at 125:3-11.) This does not constitute harassing conduct that is severe or pervasive. See Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (noting that "[s]imple teasing, offhand comments, and isolated incidents (unless extremely serious)" is not sufficient). Examples of conduct that has sufficed as severe and pervasive include: frequently making statements that are derogatory to women generally, denying vacation requests, giving undesirable assignments, verbal abuse, disparaging treatment, exclusion from important meetings, several attempts to have the plaintiff transferred, and a supervisor's sexual solicitation of the plaintiff. Hurley v. Atl. City Police Dep't, 933 F. Supp. 396, 408, 416 (D.N.J. 1995). Plaintiff admits that she was treated well. Therefore, she has no cause of action for hostile work environment under LAD.

### 3. Common Law Wrongful Discharge

"[A]n employee has a cause of action for wrongful discharge when the discharge is contrary to a clear mandate of public policy. The sources of public policy include legislation; administrative rules, regulations or decisions; and judicial decisions." Pierce v. Ortho Pharm. Corp., 84 N.J. 58, 72 (1980). The employee "may maintain a cause of action in contract or tort or both." Id.

Similar to the hostile environment claim, Plaintiff's opposition brief does not address the common law wrongful discharge claim. Hapag-Lloyd argues that Plaintiff's common law wrongful discharge claim should be dismissed because LAD preempts it. (Def.'s Br. 15.) This Court agrees. In Erikson v. Marsh & McLennan Co., the New Jersey Supreme Court noted that "if LAD creates a remedy, 'it might be unnecessary to recognize or create a Pierce-type

15

[(common law wrongful termination)] action to vindicate substantially the same rights and provide similar relief.'" 117 N.J. 539, 562 (1990) (quoting Shaner v. Horizon Bancorp, 116 N.J. 433 (1989)). The New Jersey Appellate Division has also held that common law claims for discrimination are preemptd by LAD. The court expressed its view on the issue as follows:

> Our Legislature had declared the remedies available under the LAD and would appear to have expressed the view that a common law claim for discrimination is unnecessary as the statute should be read broadly enough to encompass those claims and damages previously available at common law. . .
>
> Based on the legislative intent demonstrated by N.J.S.A. 10:5-3, we conclude that the plaintiff's common law claim that he was terminated because of his age in violation of public policy should not have been submitted to the jury. His right and cause of action were statutory.

Catalane v. Gilian Instrument Corp., 271 N.J. Super. 476, 492 (App. Div. 1994), certif. denied, 136 N.J. 298 (1994).

Similarly, the Third Circuit in addressing the issue has held that a plaintiff "cannot advance a separate common law public policy claim" if "the sources of public policy law [] [the plaintiff] relies on are coterminous with his[/her] statutory claims." Lawrence v. Nat'l Westminster Bank, 98 F.3d 61, 73 (3d Cir. 1996). Furthermore, other courts in this district interpreting New Jersey law have also held that LAD preempts duplicative common law discrimination claims. See Santiago v. City of Vineland, 107 F. Supp. 2d 512, 567 (D.N.J. 2000) ("New Jersey courts and courts interpreting New Jersey law have held that common law claims for wrongful discharge in violation of public policy are preempted when a statutory remedy under the NJLAD exists."); DeJoy v. Comcast Cable Communications, Inc., 941 F. Supp. 468, 475-76 (D.N.J. 1996) (holding that LAD preempts the plaintiff's common law wrongful discharge claim); Kapossy v. McGraw-Hill, Inc., 921 F. Supp. 234, 249 (D.N.J. 1996) (stating

that "a common law claim for wrongful termination is not viable insofar as it seeks the same remedy available under the NJLAD."); Butler v. Sherman, Silverstein & Kohl, 755 F. Supp. 1259, 1265 (D.N.J. 1990) (interpreting the court's holding in Erikson to mean that the New Jersey "Supreme Court does not intend to allow a supplementary common law cause of action where the NJLAD provides a remedy for the wrong."). Plaintiff's wrongful discharge claim is premised on the same facts as her sex discrimination claim under LAD and she seeks the same remedies as her LAD claim. Consequently, Hapag-Lloyd is entitled to summary judgment because Erthal cannot pursue a common law wrongful discharge claim.

**4. Intentional Infliction of Emotional Distress**

Generally, to establish a claim for intentional infliction of emotional distress, the plaintiff must show "intentional and outrageous conduct by the defendant, proximate cause, and distress that is severe." Buckley v. Trenton Sav. Fund Soc'y, 111 N.J. 355, 366 (1988). Conduct is outrageous when it is "so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Id. (citation and internal quotation marks omitted). "The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." Taylor v. Metzger, 152 N.J. 490, 509 (1998) (quoting 49 Prospect St. Tenants Ass'n v. Sheva Gardens, Inc., 227 N.J. Super. 449, 472 (App. Div. 1988)) (internal quotation marks omitted). Furthermore, "[i]n New Jersey, it is 'extremely rare to find conduct in the employment context that will rise to the level of outrageousness necessary to provide a basis for recovery for the tort of intentional infliction of emotional distress.'" Sanchez v. SunGard Availability Services LP, 362 Fed. Appx. 283, 288 (3d Cir. 2010) (quoting Griffin v. Tops Appliance City, Inc., 337 N.J. Super. 15, 23-24 (App. Div. 2001)); see also Witherspoon v. Rent-A-Car-Center, Inc., 173 F. Supp. 2d 239, 242 (D.N.J.

2001) ("it is particularly difficult to establish intentional infliction of emotional distress in the employment context.").

Plaintiff's brief in opposition to Defendant's Motion does not address her intentional infliction of emotional distress claim. However, Plaintiff alleges that Defendant's discrimination and her subsequent termination were outrageous and caused her to be physically distraught and sustain shock to her nervous system. (Compl. ¶ 20.) Plaintiff could not explain how she sustained shock to her nervous system, (Erthal Dep. 130:3-7); however, she testified that her breast milk supply decreased in April 2009 as a result of the stress caused by Defendant's conduct. (Id. at 79:6-14.) Erthal testified that she consulted her baby's pediatrician regarding the decrease in her breast milk and the issue was resolved within four days. (Id. at 80:2-17.) Other than the pediatrician, Plaintiff did not consult any other doctor, psychologist, psychiatrist or counselor about the alleged shock to her nervous system. (Id. at 78:20-21-1, 130:13-18.)

This Court has already determined that Defendant did not discriminate against Plaintiff; therefore, that cannot be a basis for finding intentional infliction of emotional distress. In any event, "[e]ven terminations based on discrimination, without accompanying harassment or something akin thereto, do not state a cause of action for the intentional infliction of emotional distress." Lemke v. Int'l Total Services, 56 F. Supp. 2d 472, 489 (D.N.J. 1999) (citing Borecki v. E. Int'l Mgmt. Corp., 694 F. Supp. 47, 62 (1988)). The record is devoid of any facts showing that Plaintiff was harassed.

Additionally, her termination alone is insufficient to sustain a claim for intentional infliction of emotional distress. There is nothing in the record to indicate that Defendant's termination of Erthal was extreme or outrageous. In fact, Erthal testified that she was treated professionally when her position was eliminated and when she was terminated. (Id. at 132:17-

20.) Moreover, courts have noted that under New Jersey law "termination of employment does not, without evidence of harassment, support a claim of intentional infliction of emotional distress." McNemar v. Disney Store, 91 F.3d 610, 623 (3d Cir. 1996), cert. denied, 519 U.S. 1115 (1997); see also Cox v. Keystone Carbon Co., 861 F.2d 390, 395 (3d Cir. 1988) ("while loss of employment is unfortunate and unquestionably causes hardship, often severe, it is a common event and cannot provide a basis for recovery for intentional infliction of emotional distress.") (citation and internal quotation marks omitted), cert. denied, 498 U.S. 811 (1990); Borecki, 694 F. Supp. at 61 ("Generally, decisions to discharge an employee have not been found to constitute intentional infliction of emotional distress."). Accordingly, Plaintiff's claim fails on the merits and Defendant is entitled to summary judgment.

## CONCLUSION

For the reasons stated above, Defendant's Motion is GRANTED.

**SO ORDERED.**

s/ Susan D. Wigenton  
**Susan D. Wigenton, U.S.D.J.**

cc: Madeline Cox Arleo, U.S.M.J.